Under the Revenue Act of 1921, the invested capital of a corporation must be based upon the amount of capital contributed by the stockholders to the corporation plus the earned surplus. The only contribution of capital reflected upon the taxpayer's books of account upon organization was net tangibles of $40,000. If assets of a value in excess of $40,000 were contributed, they were not contributed in exchange for shares of stock.

The income bonds were payable, principal and interest only, from moneys to be earned by the corporation in the future and payments were to be made out of such earnings only after they had been ascertained and declared by the board of directors of the taxpayer applicable to such payments "after appropriating to the capital account" such portion of the net earnings as the board of directors might deem advisable. The bonds were in no sense a lien upon any part of the assets turned over to the corporation by the stockholders. They were issued to the owners of the assets of the predecessor business in the same proportion that the capital stock was issued to them. They were in effect nothing more than an appropriation of the future earnings of the taxpayer.

We are of the opinion that the Commissioner has correctly held that the assets of the predecessor business were paid in to the taxpayer corporation for its capital stock of $40,000. The payment of $400,000 in redemption of the bonds was simply a distribution of earnings by the corporation to its stockholders. We do not think that the evidence of record warrants the restoration to surplus, or the inclusion in invested capital, of any part of the $400,000 in question.

---

## APPEAL OF MATOS ADVERTISING AGENCY.

Docket No. 3743.	Submitted September 23, 1925.	Decided November 18, 1925

*Walter Willard, Esq.*, for the taxpayer.
*J. Arthur Adams, Esq.*, for the Commissioner.

### Before GRAUPNER, TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency in income and profits taxes in the amount of $1,961.27 for the calendar year 1919. In its petition the taxpayer claims classification as a personal service corporation and, in the event such classification is denied, it requests assessment under section 328 of the Revenue Act of 1918. No evidence was offered at the hearing in support of the claim for special assessment, leaving in issue only the question of whether the taxpayer is entitled to personal service classification.

### FINDINGS OF FACT.

The taxpayer is a Pennsylvania corporation with its principal place of business in Philadelphia. It was incorporated in 1910 for the purpose of conducting a general advertising agency and had a capital of $10,000, divided into 100 shares of capital stock. The stock was paid for in cash and was held as follows:

|  | Shares. |
|---|---|
| William W. Matos, president and treasurer | 98 |
| E. B. Matos (wife of William W. Matos) | 1 |
| Joseph H. Hughes | 1 |
| Total | 100 |

William W. Matos devoted his entire time to the business of the taxpayer. E. B. Matos and Joseph H. Hughes gave no time to the business and performed no services for the taxpayer.

The work of the agency was the acceptance of business from mercantile concerns which use advertising, advising them how best to utilize advertising in their distribution and sales plan, preparation of booklets, and placing of advertising where necessary. All advertising copy was prepared under the direction of William W. Matos, who, for a number of years prior to the organization of the agency, had been engaged in newspaper work in Philadelphia. During that time he had been rendering advertising and editorial services to several persons, which led to his establishing an advertising agency.

The income of the taxpayer consists of fees charged for such work as the preparation of circulars and commissions on advertising placed with newspapers, periodicals, and similar advertising media.

In all cases of advertising placed with publications the space was obtained in the name of the advertiser. The publications bill the agency monthly for the space used, designating the advertiser, and in many cases render separate bills for each advertiser, and the agency about the same time bills the advertiser for the amount due. The agency bills the advertiser for the full amount of the cost of space used, less, in some cases, 2 per cent for payment in 10 days, and, in remitting to the publishers, deducts its commission, which ranges from 10 per cent to 15 per cent.

Space purchased by one advertiser can not be used by or transferred to any other, nor can space in the newspapers be purchased in bulk. If space contracted for is not used in full, the portion used is billed to the advertiser at the rate governing such smaller amount.

In 1919 the taxpayer employed two bookkeepers, one stenographer and one checking clerk, who were paid a total of $7,570.65. The duty of the checking clerk was to check space used in newspapers. During the early part of 1919 the taxpayer also employed, on a

salary, a technical copy writer, who was engaged in the taxpayer's advertising department.

Taxpayer also had one employee who solicited daily advertising from local brokers. For his services he was paid 50 per cent of the commissions, amounting in 1919 to $11,512.50.

The taxpayer was one of the originators and is a member of the American Association of Advertising Agencies, an organization consisting of over a hundred agencies. In order for an agency to become a member it must file an application describing its organization, what lines of advertising it handles, and its departments, such as analytical, research, art, and copy work. The association maintains supervision over its members to compel observance of its ethics, which require, principally, that proper service be rendered advertisers and that members assume an obligation to publications for advertising space used by their clients.

Members of this association are not automatically granted recognition and credit by publishers, but are investigated by the American Newspaper Publishers Association. The latter association then makes its recommendation to the publishers, who, if the agency be favorably recommended, grant it recognition and extend credit for the advertising space ordered. The agencies are notified by letter that the publisher's association has accorded them recognition. If payment of client's accounts is not made, the agency loses its recognition. Members of the advertising association submit balance sheets to it and the association furnishes statements to the publisher's association.

The balance sheets of the taxpayer for 1918 and 1919 were as follows:

|  | 1918 | 1919 |
|---|---|---|
| **ASSETS.** | | |
| Cash | $2,955.83 | $7,158.66 |
| Investments | 2,200.00 | 700.00 |
| Liberty bonds | | 3,100.00 |
| Furniture and fixtures | 1,949.17 | 1,935.83 |
| Accounts receivable | 32,749.03 | 37,441.73 |
|  | 39,854.03 | 50,336.22 |
| **LIABILITIES.** | | |
| Capital stock | 10,000.00 | 10,000.00 |
| Loans | 8,319.58 | 13,319.58 |
| Accounts payable | 18,441.43 | 14,564.83 |
| Undivided profits | 3,093.02 | |
| Dividends payable | | 12,451.81 |
|  | 39,854.03 | 50,336.22 |

In 1919 the taxpayer placed total advertising amounting to $304,559.92, on which commissions, representing gross income, amounted to $44,222.90. It claimed a deduction in the return filed of $1,499.77, representing unpaid advertisers' accounts which the taxpayer had paid publishers.

DECISION.

The determination of the Commissioner is approved.

---

## APPEAL OF LEWIS DILL.

Docket No. 4563.   Submitted October 14, 1925.   Decided November 18, 1925.

*Emos S. Stockbridge* and *R. K. Slaughter, Esqs.*, for the taxpayer.
*P. J. Rose, Esq.*, for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This is an appeal from the determination of a deficiency of $1,393.90, income tax for 1922.

### FINDINGS OF FACT.

Prior to 1912 the taxpayer had been engaged in the lumber business as an individual. In 1912 a partnership was formed under the name of Lewis Dill & Co. to continue this business. The firm was composed of taxpayer and one T. A. Myers who had been an employee of the taxpayer. Myers made no contribution to the partnership capital, all of which was contributed by taxpayer. In 1912 a lot described as 11 Overhill Road, Baltimore, was purchased from the partnership funds, and in 1912 and 1913 a residence was erected on such lot, the cost of which also was paid from partnership funds. Title to such lot was taken in the name of the taxpayer and the property was carried as an asset on the books of the partnership. The property was used by taxpayer as his dwelling and, in computing and dividing partnership profits, he was charged with interest of 6 per cent on the cost of $24,804.05.

In 1916, L. Alan Dill, son of the taxpayer, was admitted to the partnership, which was then composed of Lewis Dill, T. A. Myers, and L. Alan Dill. The latter made no contribution to the partnership capital.

In 1920, Myers withdrew and there was paid to him, from the partnership assets, his portion of the partnership earnings which had not previously been drawn by him and had been credited to his capital account. Since that date the business has been conducted in the same name by the taxpayer and his son.

In 1922 the dwelling house was sold for $40,000. The profit was shown upon the partnership profit and loss account and reported as income of the partnership. The Commissioner has included the profit as income to the taxpayer.

There were no written agreements upon the formation of any of the partnerships and no agreement as to the distributive share. At